**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION** | : | **COMPLAINT** |
| | : | |
| Plaintiff, | : | |
| | : | **Civil Action No.** |
| | : | |
| **ROUZBEH HAGHIGHAT,** | : | |
| **BEHROUZ HAGHIGHAT,** | : | |
| **KIRSTYN PEARL,** | : | **JURY TRIAL DEMANDED** |
| **SEYEDFARBOD SABZEVARI, and** | : | |
| **JAMES ROBERGE** | : | |
| | : | |
| Defendants. | : | |

**COMPLAINT**

Plaintiff Securities and Exchange Commission (the "Commission"), 33 Arch Street, 24th

Floor, Boston, MA 02110, alleges as follows against the Defendants, whose names and last

known addresses are set forth below:

a. Rouzbeh Haghighat a/k/a "Ross" Haghighat
   10 Coffin Street
   West Newbury, Massachusetts 01985

b. Behrouz Haghighat a/k/a "Bruce" Haghighat
   14 O Hill Ridge
   Laguna Nigel, California 92677

c. Kirstyn Pearl
   900 Calle Emilio Gonzalez, A 103
   Isabela, Puerto Rico 00662

d. Seyedfarbod Sabzevari a/k/a "Fabio" Sabzevari
   5115 Lankershim Blvd.
   Apt. 619
   North Hollywood, California 91601

1

    e.  James Roberge
       1 Links Road
       Westford, Massachusetts 01886

## PRELIMINARY STATEMENT

1.  This case involves illegal insider tipping and trading in the securities of Chinook Therapeutics, Inc. ("Chinook") in the days leading up to the public announcement on June 12, 2023 that the company would be acquired by Novartis AG ("Novartis"). On the day of the announcement, Chinook common stock closed at $37.98 per share, an increase of $13.99 per share, or approximately 58% from the prior day's closing price.

2.  The announcement of Chinook's acquisition was preceded by weeks of confidential negotiations between Chinook and Novartis. These negotiations were led by Chinook's management and its board of directors. Defendant Ross Haghighat was a member of Chinook's board of directors during these negotiations and owed the company and its shareholders a duty to protect the confidentiality of the information he learned in this position.

3.  Defendant Ross Haghighat breached this duty by providing material, non-public information ("MNPI") concerning the acquisition of Chinook to his family and friends, specifically, his brother, Bruce Haghighat, his step-daughter, Kirstyn Pearl ("Pearl"), and his friends Fabio Sabzevari ("Sabzevari") and James Roberge ("Roberge")—each of whom knew, consciously avoided knowing, or was reckless in not knowing that (i) Ross Haghighat was a member of Chinook's board of directors or otherwise affiliated with Chinook, and (ii) he conveyed this information in breach of his duty.

4.  After receiving this MNPI from Ross Haghighat, Defendants Bruce Haghighat, Pearl, Sabzevari, and Roberge traded on it by purchasing Chinook securities in advance of the public announcement of the company's acquisition. In addition, Ross Haghighat purchased

2

Chinook stock in a custodial account he managed for a minor stepchild in advance of the public announcement of the company's acquisition. In this way, all five Defendants—Ross Haghighat, Bruce Haghighat, Pearl, Sabzevari, and Roberge—reaped the unfair advantage of buying Chinook securities based on MNPI prior to the acquisition's announcement to the general public and the resultant price increase.

5.      The acquisition of Chinook by Novartis was announced before market open on June 12, 2023. As a result of the announcement, the price of Chinook's stock rose dramatically that day and closed at $37.98 per share. Based on their illegal purchases of Chinook securities prior to the announcement, Defendants Ross Haghighat, Bruce Haghighat, Pearl, Sabzevari, and Roberge collectively gained over $500,000 for themselves or others.

6.      By knowingly or recklessly engaging in the conduct described in this Complaint, Defendants Ross Haghighat, Bruce Haghighat, Pearl, Sabzevari, and Roberge violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

7.      The Commission seeks against each Defendant an injunction against future violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by engaging in the transactions, acts, practices, and courses of business of the type alleged in this Complaint, disgorgement of illicit profits, prejudgment interest thereon, and a civil penalty.

8.      The Commission further seeks entry of an order barring Ross Haghighat from serving as an officer or director of a public company.

## JURISDICTION AND VENUE

9.      The Commission brings this action pursuant to Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1].

10.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, and Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa]. The Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the acts, practices, transactions, and courses of business alleged in this Complaint.

11.     Venue in this district is proper under 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the acts, practices, transactions and courses of business constituting the alleged securities law violations occurred within this district. The Defendants' trades in Chinook's securities were executed on stock market computer servers installed in various locations in New Jersey.

## DEFENDANTS

12.     Ross Haghighat, age 62, is a businessman, investor, and corporate executive with years of experience serving as a director on the boards of public and private companies. At the time of negotiations between Chinook and Novartis between May and June 2023, Ross Haghighat was a member of Chinook's board of directors, and he was also on the board's audit committee. When his term on the board expired on or around June 9, 2023, Ross Haghighat entered into a consulting agreement with Chinook during which he was paid the remainder of his "2023 Board Compensation." He has also previously served as a director and officer of other companies whose securities have been registered with the Commission, and he recently served as Chairman, Chief Executive Officer ("CEO"), and director of Company A, a private engineering product research and development company located in Chelmsford, Massachusetts.

13. Bruce Haghighat, age 60, is Ross Haghighat's brother. Bruce Haghighat serves as trustee of a trust established by Ross Haghighat for the benefit of Ross Haghighat's children.

14. Kirstyn Pearl, age 36, is Ross Haghighat's stepdaughter.

15. Fabio Sabzevari, age 31, is Ross Haghighat's friend and, until October 2023, was also his employee at Company A.

16. James Roberge, age 70, is Ross Haghighat's friend.

## RELEVANT ENTITIES

17. Chinook was a Seattle-based biopharmaceutical company focused on the discovery, development, and commercialization of precision medicines for kidney diseases. Prior to being acquired by Novartis, Chinook stock was registered with the Commission and traded on the NASDAQ stock market ("NASDAQ") under the symbol KDNY.

18. Novartis is a Swiss holding company that, directly or indirectly, owns a multinational group of operating companies specializing in the research, development, manufacturing and marketing of a broad range of pharmaceuticals and medicines. Novartis' shares are listed in Switzerland on the SIX Swiss Exchange. Novartis makes its stock available in United States markets through the American Depository Receipts ("ADR") Program. Novartis ADRs are listed on the New York Stock Exchange and trade under the symbol NVS. Novartis's United States operations are based in or around East Hanover, New Jersey.

## FACTUAL ALLEGATIONS

### A.    Timeline of Novartis's Acquisition of Chinook

19. On May 4, 2023, the CEO of Novartis contacted the CEO of Chinook and made a verbal proposal for Novartis to acquire Chinook at an all-cash purchase price of $32 per share of Chinook common stock. That same day, Novartis followed this verbal offer with a formal written non-binding preliminary proposal communicating the same terms ("May 4 Proposal"), indicating

5

that the price represented a 67% premium to Chinook stock's closing price from the previous day.

20. On May 4, 2023, Chinook's CEO informed the company's board of directors, which included Ross Haghighat, about the unsolicited offer, and planned a board meeting for the following day, May 5, 2023.

21. On May 5 and 6, 2023, Chinook's board, including Ross Haghighat, met to discuss the May 4 Proposal. The board directed company management to communicate to Novartis that the bid was too low and to offer to make a presentation to encourage Novartis to make a higher bid.

22. Between May 8 and May 15, 2023, Chinook's management communicated the board's message to Novartis, entered into a confidentiality agreement with Novartis, and presented information to Novartis about Chinook's product development programs and market opportunities.

23. On May 22, 2023, Novartis communicated to Chinook management that it would increase its purchase price offer to $36 per share of Chinook common stock ("May 22 Proposal").

24. Later that same day, Chinook's board, including Ross Haghighat, met with Chinook's senior management and its financial advisers to discuss the May 22 Proposal. Following the discussion, the Chinook board determined to make a counteroffer to Novartis. The board directed one of Chinook's financial advisers to inform Novartis that Chinook would be willing to proceed with the proposed transaction at a price of $40 per share plus a contingent value right that would pay an additional $4 per share upon the submission to the U.S. Food and

6

Drug Administration ("FDA") of a New Drug Application ("NDA") for a particular drug product candidate (the "drug product candidate") being developed by Chinook.

25. On May 23, 2023, one of Chinook's financial advisers communicated the counteroffer to Novartis.

26. On May 26, 2023, Novartis informed one of Chinook's financial advisers that Novartis was willing to increase its proposed purchase price to $40 per share and a contingent value right of an additional $4 per share based upon FDA approval of the drug product candidate ("May 26 Proposal"). As part of the May 26 Proposal, Novartis requested that Chinook negotiate with Novartis on an exclusive basis.

27. Later that same day, Chinook's board, including Ross Haghighat, met with senior management and its financial advisers to discuss the May 26 Proposal. Following the discussion, the Chinook board determined to make a counteroffer to Novartis. The board directed one of its financial advisers to inform Novartis that Chinook would be willing to proceed with the proposed transaction at a price of $40 per share plus a contingent value right to (i) an additional payment of $2 per share upon FDA approval of an NDA for the drug product candidate for a particular indication for use and (ii) an additional $2 per share upon FDA approval of an NDA for the same drug product candidate for a second indication for use ("May 26 Counteroffer Proposal"). The Chinook board directed one of its financial advisers to communicate the counteroffer to Novartis as well as Chinook's willingness to negotiate exclusively until at least June 12, 2023, if Novartis determined the counteroffer to be acceptable. Chinook's financial adviser communicated this message to Novartis on May 26, 2023.

28. On May 27, 2023, Novartis advised Chinook's financial adviser that it would proceed based on Chinook's May 26 Counteroffer Proposal with certain modifications to the

contingent value right provisions. Novartis stated that this was its best and final offer. Later that same day, Chinook's CEO informed the board, including Ross Haghighat, of this modified offer. The board, including Ross Haghighat, directed Chinook management to proceed with Novartis' proposed acquisition, on an exclusive basis, based on this best and final offer. And Novartis was advised of the board's determination to proceed on the basis of this best and final offer.

29. Between May 27 and June 10, 2023, Chinook provided Novartis with expanded, customary due diligence materials, and the parties circulated and negotiated draft written agreements.

30. On June 11, 2023, the Chinook board, senior management, and its financial advisers held a meeting, which Ross Haghighat attended. The board reviewed and discussed the negotiated terms of the merger agreement and contingent value rights agreement, and the board approved the merger agreement and proposed transaction. Thereafter, Chinook and Novartis executed the merger agreement.

31. On the following day, June 12, 2023, prior to the opening of the U.S. stock markets, the merger parties issued a joint press release publicly announcing the transaction. By the end of that trading day, Chinook's common stock price had risen to close at $37.98 per share, an increase of 58.3% over the prior trading day's closing price of $23.99 per share. This price increase was accompanied by a spike in the volume of trading activity in Chinook shares. On June 12, 2023, over 22 million Chinook shares were traded. By comparison, the average daily volume of trading in Chinook shares during the two weeks prior to the public announcement was 729,232 shares.

**B.**      **Chinook's Protection of Confidential, Material Non-Public Information**

32.      Chinook maintained an Insider Trading Policy ("Policy") protecting its confidential MNPI. The Policy was in effect during the relevant period between May 4 and June 12, 2023 (the "Relevant Period").

33.      The Policy applied to all company employees and directors, as well as to their immediate family members sharing their households or those financially dependent upon them or subject to their influence or control.

34.      The Policy defined "material information" as "information about our company, positive or negative, that a reasonable stockholder would consider useful when buying or selling our stock." The definition included, as an example of MNPI, not-yet-announced "mergers or acquisitions."

35.      According to the Policy, its "primary purpose" was "to prevent people who are in possession of MNPI from profiting from that MNPI before it is made publicly available, thus allowing all of our stockholders to benefit from the information at the same time." The Policy further stated that "federal securities laws prohibit a person from using MNPI to make decisions about trading our stock, including tipping off someone else with that information so that they can trade our stock."

36.      The Policy specifically warned covered persons thinking of trading Chinook stock: "1. Never buy or sell our stock when in possession of MNPI" and "2. Keep all MNPI confidential, including from your family and friends."

37.      Chinook also maintained a Code of Business Conduct and Ethics ("Code") that applied to all directors, officers and employees. With regard to insider trading, the Code stated, "The bottom line is that we never buy or sell securities based on inside information, nor do we tip-off others to do so. It doesn't matter how we learned the information – using material

nonpublic information to make a trade is never acceptable. Doing so violates the law and the trust we've built with our fellow employees, and with our suppliers, vendors, collaborators and investors, and others."

38.     As a member of the Chinook board when it adopted both the Policy and Code, Ross Haghighat was aware of Chinook's prohibitions against insider trading and tipping during the Relevant Period.

**C.      Ross Haghighat Obtained MNPI at Confidential Chinook Board Meetings.**

39.     On May 4, 2023, Ross Haghighat was informed of the Novartis offer to purchase Chinook. As a Chinook board member, the company provided Ross Haghighat with MNPI concerning Novartis' offers to purchase Chinook and the competitive bidding process that resulted in a sale of the company.

40.     Ross Haghighat knew or was reckless in not knowing that the information he received about the proposed acquisition was material and non-public.

41.     Ross Haghighat knew or was reckless in not knowing that, as a board member, he had a duty to Chinook and its shareholders to keep this MNPI in confidence.

**D.      Ross Haghighat Tipped His Brother Bruce Haghighat Who Traded on Chinook's MNPI.**

42.     In or about May 2023, Ross Haghighat tipped his brother Bruce Haghighat with MNPI concerning the potential acquisition of Chinook. In making this tip, Ross Haghighat expected to benefit from Bruce Haghighat using the MNPI to place profitable trades in a trust that Ross Haghighat had set up for the benefit of Ross's children.

43.     Bruce Haghighat knew, consciously avoided knowing, or was reckless in not knowing that Ross Haghighat was a member of the Chinook board of directors or otherwise affiliated with Chinook.

44.    At the time Bruce Haghighat received this tip, he further knew, consciously avoided knowing, or was reckless in not knowing that the information provided to him was both material and non-public.

45.    Accordingly, Bruce Haghighat knew, consciously avoided knowing, or was reckless in not knowing that Ross Haghighat breached his duty to Chinook by tipping him so that Bruce Haghighat could place profitable trades for the benefit of Ross Haghighat and his children.

46.    The circumstances of Ross Haghighat's tip and Bruce Haghighat's illicit stock purchase include the following facts.

47.    Bruce Haghighat served as trustee for a trust for which Ross Haghighat was the grantor and Ross Haghighat's children were the beneficiaries (the "Trust").

48.    On May 25, 2023, three days after Ross Haghighat learned about the May 22 Proposal, Bruce Haghighat emailed his broker, stating: "I have a short window of opportunity for a transaction. Is the [Trust brokerage] account set up in a way that I can trade options?" The broker responded: "Unfortunately, that account is not set up for options trading. Would you like to add that capability to the account?" Bruce Haghighat replied: "Yes, Pls add this option to this account ASAP. I will have a transaction for you as early as Friday, or next Tuesday. Pls let me know when this feature has been added."

49.    That same day, the broker responded to Bruce Haghighat: "Because of the complexity of options trading and our compliance process, I think it would be in your best interest to place any options trading directly with … another broker…" Bruce Haghighat replied: "Well time is of the essence. I have an opportunity transaction next week."

50.     On May 26, 2023, the same day Chinook's board met with senior management and its financial advisers to discuss Novartis's May 26 Proposal, Bruce Haghighat and Ross Haghighat spoke on the phone and texted each other multiple times. In these texts, they had the following exchange:

- **Bruce**: What is the stick [sic] symbol?

- **Ross**: Kdny

- **Bruce**: [The broker] called me and he needs 3 days to set up for options. I am just going to buy it direct. If you change your mind, let me know in the next hour.

51.     Following this text exchange, Ross Haghighat called Bruce Haghighat and they spoke for over a minute. Bruce Haghighat then spoke with his broker who managed a brokerage account in the name of the Trust, and almost immediately afterward, Bruce Haghighat texted Ross Haghighat: "Done. Let me know the exit." Ross Haghighat replied: "OK we can talk." On May 26, 2023, Bruce Haghighat bought 2,000 Chinook shares at $22.66 per share through the brokerage account in the name of the Trust.

52.     On June 12, 2023, the day that the merger of Chinook and Novartis was announced, Ross Haghighat and Bruce Haghighat exchanged the following texts:

- **Bruce**: Let me know when u want to sell the stock

- **Ross**: Oh right. Let's all [sic] it for $39 anytime

- **Ross**: Bruce Ali, on second thought, hold on to it. The deal is $40 +2+2 or $42/sh. The deal should close in August. Stock is at $38. Seems it has another 5-8% gain to go. So let's leave it alone. Thnx.

53.     Approximately one month later, on July 7, 2023, Bruce Haghighat sold 2,000 Chinook shares at $39 per share from the Trust-held brokerage account, generating unjust gains in the amount of $30,640.

12

54.    On July 10, 2023, Bruce Haghighat texted Ross Haghighat: "The stuff sold. All in cash now. If u r not moving it, we should put it into a MM fund. Will pay about 4-5% ..."

55.    On July 24, 2023, the illicit trading profits of $30,640, along with other funds in the account, were wired from the Trust-held brokerage account to another financial account held in the name of the Trust.

### E.    Ross Haghighat Tipped His Stepdaughter Kirstyn Pearl Who Traded on Chinook's MNPI.

56.    In or about May 2023, Ross Haghighat tipped Pearl with MNPI concerning the potential acquisition of Chinook. In making this tip, Ross Haghighat provided Pearl with an illicit gift of confidential MNPI that Pearl could profit upon by purchasing Chinook securities in advance of the public announcement of the contemplated acquisition. Pearl then shared her illicit profits with Ross Haghighat.

57.    At the time Pearl received this tip, Pearl knew, consciously avoided knowing, or was reckless in not knowing that Ross Haghighat was a member of the Chinook board of directors or otherwise affiliated with Chinook.

58.    She further knew, consciously avoided knowing, or was reckless in not knowing that the information provided to her was both material and non-public.

59.    Pearl knew, consciously avoided knowing, or was reckless in not knowing that Ross Haghighat was breaching his duty to Chinook by tipping her. Pearl further knew, consciously avoided knowing, or was reckless in not knowing that Ross Haghighat provided her the tip of MNPI concerning Chinook's imminent acquisition as an illicit gift to profit upon.

60.    The circumstances of Ross Haghighat's tip and Pearl's securities purchases include the following facts.

13

61.    On May 22, 2023, the day Chinook's board met with senior management and its financial advisers to discuss Novartis's May 22 Proposal, Ross Haghighat texted Pearl:

- I just finished Board call. Going for a bite.

- Looking forward to our drive back on Wednesday

62.    Two days later, on May 24, 2023, Ross Haghighat drove Pearl from New York City to Ross Haghighat's home in West Newbury, Massachusetts, and, within hours of their arrival, Pearl visited a website for an options profit calculator. An options profit calculator is a tool used to estimate the potential profit on a hypothetical options trade.

63.    Between May 24, 2023, and May 26, 2023, Pearl made a series of electronic fund transfers into her brokerage account totaling $2,050.

64.    On May 26, 2023, Pearl made a $5,000 cash deposit into her bank account at an ATM located in or around Newburyport, Massachusetts, not far from Ross Haghighat's home, which she subsequently transferred into her brokerage account. On that same day, Pearl entered orders to purchase Chinook call options in her brokerage account, but her orders were rejected because her recently deposited funds were still on hold. Four days later, on May 30, 2023, Pearl again entered orders to purchase Chinook call options in her brokerage account, but her orders were again rejected because the funds she deposited were still on hold.

65.    An option is, in substance, a contract that gives the option's owner the right to buy or sell shares of the underlying stock at a set price per share, known as the option's "strike price." Options to buy shares are known as "call" options. An option's expiration date is the last day the options holder has the right to buy or sell the underlying asset at the strike price.

66.    On June 5, 2023, Pearl purchased 153 Chinook call options with a strike price of $30 and an expiration date of June 16, 2023.

14

67. On the day Pearl bought the Chinook call options, the company's stock was trading at prices ranging from $24.32 to $25.47, and the options that Pearl purchased were "out-of-the-money." When a call option's strike price is greater than the market price of the underlying stock, the option is "out-of-the-money" because the exercise of the option and sale of the stock into the market would result in a trading loss. If the underlying stock later trades at a price above the option's strike price, the option is considered to be "in-the-money" because the option owner can exercise the call option and buy the stock at the strike price and then sell the stock into the market for a profit.

68. Pearl's purchase of call options with a $30 strike price and a June 16, 2023 expiration date meant she was anticipating that the price of Chinook's common stock would rise above $30 per share in less than two weeks. At the time of Pearl's option purchases, Chinook's common stock had never traded at a price above $30 per share.

69. In the early morning of June 12, 2023, within hours after the acquisition had been publicly announced, Pearl sent the following texts to Ross Haghighat about premarket trading in Chinook's securities:

- 4 am on the dot $35k order in from someone at $39/share

- Passing out - night!

70. Later that day, Ross Haghighat texted Pearl:

- Did u get it done?

71. Within minutes of the text, Pearl sold some of her Chinook call options and then sent Ross Haghighat the following text:

- Chunks/game plan finalized – excited to show u when you get home. going to [a social club] in Boston with a friend later, helping mom now with the yard work

72. Between June 12, 2023, and June 14, 2023, Pearl sold all of her remaining Chinook call options in small batches (or "chunks") via multiple trades. In total, Pearl's options trading generated total illegal gains of approximately $115,949.

73. On Thursday, July 6, 2023, Pearl and Ross Haghighat exchanged the following text messages, discussing what to do with the money made from the illegal insider trading of Chinook securities:

- **Pearl**: Tuesday for $ in my bank, scheduled to clear monday (just called)
- **Ross**: Oh nice. Life is good. Decide how much of it you plan to save. Move it and forget it. Saving is done at the beginning, never at the end. I'm glad this worked out honey
- **Pearl**: Unfortunately not much to save after I pay off all school loans/debt - $58k total for every last penny I owe. BUT what a friggin blessing to be debt free at this stage of my life. So glad it worked out as well – very very very grateful

74. A few weeks later, on August 2, 2023, Pearl and Ross Haghighat exchanged the following text messages discussing how to transfer some of the illicit profits to Ross:

- **Ross**: Kirst, I'd like to close the loop on fund transfer this week. Easiest is to write out a check or transfer to me and I'll redirect into individual accounts. Let's discuss logistics tonight. Thnx.
- **Pearl**: No prob – it's sitting in my [brokerage] account as cash, I'll transfer it to my bank now so it goes in in next 48 hrs
- **Pearl**: Was gonna do it last week but got sidetracked with the nyc stuff, everything here, sorry
- **Pearl**: But yes no prob to get a cashiers check over to you when ready

75. Two days later, on August 4, 2023, Pearl transferred approximately $62,757 from her brokerage account to her bank account.

76. On or about August 7, 2023, Pearl caused a cashier's check in the amount of $55,000 to be drawn from her bank account for the benefit of Ross Haghighat.

16

77.    Between August 9 and August 11, 2023, Pearl and Ross Haghighat exchanged a series of texts indicating that Pearl gave the cashier's check to Ross Haghighat who then lost the check. In these texts, Pearl and Ross Haghighat discussed that it could take 90 days to cancel and replace the cashier's check, and Pearl noted that she had lied to the bank manager about the purpose of the payment in order to expedite it.

78.    On or about November 6, 2023, after the funds for the initial cashier's check had been credited back to her account, Pearl caused a cashier's check in the amount of $55,000 to be drawn from her bank account for the benefit of Ross Haghighat. This check was deposited into Ross Haghighat's bank account on or about November 13, 2023.

79.    Several months later, on April 24, 2024, Pearl and her mother, who is married to Ross Haghighat, exchanged the following texts about the lost check incident:

- **Pearl**: I just totally had a brain popping realization – you know how SOMEHOW a $60k check went missing on Ross's desk – it was intentional – since it was an illegal insider trading move by him, if he had a random big deposit immediately after the sale of the company/the stock was going up, it'd be suspicious if he was ever looked into – so he made us all think we were crazy searching around the house for that [expletive] when he prob ripped it up
- **Pearl**: He always thinks he's so friggin slick and then gets busted – I swear on my life that's what happened.
- **Pearl's Mother**: No I found it after
- **Pearl**: Did u????! lol that's hilarious
- **Pearl**: Man I was like that [expletive] sneak – made too much sense
- **Pearl's Mother**: That's what happens makes u doubt everything else
- **Pearl**: Delete these lol
- **Pearl's Mother**: Am
- **Pearl**: Yep

**F.**     **Ross Haghighat Tipped His Friend and Former Employee Fabio Sabzevari Who Traded on Chinook's MNPI.**

80.     In or about May 2023, Ross Haghighat tipped Sabzevari with MNPI concerning the potential acquisition of Chinook. In making this tip, Ross Haghighat provided Sabzevari with an illicit gift of confidential MNPI that Sabzevari could profit upon by purchasing Chinook securities in advance of the public announcement of the contemplated acquisition.

81.     At the time Sabzevari received this tip, he knew, consciously avoided knowing, or was reckless in not knowing that Ross Haghighat was a member of the Chinook board of directors or otherwise affiliated with Chinook.

82.     Sabzevari further knew, consciously avoided knowing, or was reckless in not knowing that the information provided to him was both material and non-public.

83.     Sabzevari also knew, consciously avoided knowing, or was reckless in not knowing that Ross Haghighat was breaching his duty to Chinook by tipping him. Sabzevari also knew, consciously avoided knowing, or was reckless in not knowing that Ross Haghighat provided him the tip of MNPI concerning Chinook's imminent merger for the purpose of allowing Sabzevari to make an illegal purchase of Chinook stock.

84.     The circumstances of Ross Haghighat's tip and Sabzevari's illicit stock purchase include the following facts.

85.     Sabzevari worked for Ross Haghighat as an employee of Company A, where his job included scheduling Chinook board meetings for Ross Haghighat. Sabzevari considered Ross Haghighat to be a father figure and his mentor.

86.     Sabzevari felt that he had been mistreated at Company A and had been promised a raise that he never received.

18

87.     Sabzevari knew that Ross Haghighat was affiliated with Chinook. For example, Sabzevari admitted to federal agents that he (i) managed Ross Haghighat's LinkedIn account, which included information about Ross Haghighat's affiliation with Chinook and (ii) sent emails back and forth to Chinook to schedule board meetings for Ross Haghighat

88.     On May 25, 2023, three days after Novartis's May 22 Proposal, Ross Haghighat and Sabzevari texted each other multiple times over the course of the day.

89.     On May 26, 2023, Sabzevari called his broker to inquire about how to get additional funds into his brokerage account that he could use to trade that day. During this call, Sabzevari asked: "Can I put like $10,000 cash into an ATM and deposit it into the checking account?" After the brokerage firm representative outlined deposit limits, Sabzevari commented: "I was just curious how much money I could shove into the ATM."

90.     Sabzevari then asked: "If I wanted to do options trading, and let's just say, for example, I just sold some [Company B] stock, do I have to wait til that money is settled before I can do options trading?" As the representative was checking, Sabzevari commented: "Cuz I literally just sold it." Sabzevari's brokerage records confirm he sold recently acquired shares of [Company B] for proceeds of approximately $7,800.

91.     Less than one hour later, after initiating a wire of funds into his brokerage account, Sabzevari called his broker again to "double check to see if [broker] had received it" and to see when the funds would be available to trade. During this conversation, Sabzevari stated that it was his "first time making a wire."

92.     That same day, Sabzevari sold, at a loss, shares of another recently purchased security for proceeds of approximately $35,000.

93.   From May 26, 2023, through June 6, 2023, Sabzevari purchased in his brokerage account 316 out-of-the money Chinook call options set to expire in July 2023 with strike prices ranging from $25 to $30.

94.   Sabzevari's purchase of these short-term out-of-the money call options meant that he was anticipating that the price of the underlying Chinook stock would increase quickly.

95.   On June 9, 2023, Sabzevari and Ross Haghighat exchanged text messages in the mid-afternoon. Shortly thereafter, Sabzevari purchased 620 shares of Chinook common stock.

96.   At 3:34 AM on June 12, 2023, approximately two and a half hours after the Novartis/Chinook acquisition was announced, Sabzevari telephoned his broker seeking advice about how to sell his Chinook call options. Sabzevari told his broker, "I just don't know anything really about options."

97.   Later on June 12, 2023, Sabzevari sold all his Chinook call options and common shares, reaping illegal gains of approximately $283,826.

98.   Sabzevari admitted to federal agents that Ross Haghighat told him to buy Chinook's securities prior to making his purchases.

**G.   Ross Haghighat Tipped His Friend James Roberge Who Traded on Chinook's MNPI.**

99.   In or about May 2023, Ross Haghighat tipped Roberge with MNPI concerning the potential acquisition of Chinook. In making this tip, Ross Haghighat provided Roberge with an illicit gift of confidential MNPI that Roberge could profit upon by purchasing Chinook securities in advance of the public announcement of the contemplated acquisition.

100.   At the time Roberge received this tip, he knew, consciously avoided knowing, or was reckless in not knowing that Ross Haghighat was a member of the Chinook board of directors or otherwise affiliated with Chinook.

101. Roberge also knew, consciously avoided knowing, or was reckless in not knowing that the information provided to him was both material and non-public.

102. Roberge also knew, consciously avoided knowing, or was reckless in not knowing that Ross Haghighat was breaching his duty to Chinook by tipping him. Roberge also knew, consciously avoided knowing, or was reckless in not knowing that Ross Haghighat provided him the tip of MNPI concerning Chinook's imminent merger for the purpose of allowing Roberge to make an illegal purchase of Chinook stock.

103. The circumstances of Ross Haghighat's tip and Roberge's illicit stock purchase include the following facts.

104. Roberge and Ross Haghighat are close friends who bike together, meet for dinner and drinks, and communicate regularly.

105. Roberge admitted to federal agents that he knew that Ross Haghighat was affiliated with Chinook.

106. On Sunday, May 7, 2023, three days after Novartis's May 4 Proposal, Ross Haghighat went to Roberge's house around 3:30 PM.

107. Less than two hours later, at 5:20 PM, Roberge placed an order to buy 500 Chinook shares in one of his brokerage accounts, which executed the next morning. Prior to this purchase, Roberge's last trading in Chinook occurred in July 2021, when he sold the 120 shares of Chinook stock he held at that time.

108. Minutes later, at 5:26 PM on May 7, 2023, Roberge initiated a $60,000 transfer from his bank to his brokerage account, which he later used to buy additional Chinook shares.

109.    Early the next morning, on May 8, 2023, Roberge bookmarked a NASDAQ webpage for pre-market trading in Chinook's stock. Then, later that morning, he purchased a total of 6,000 shares of Chinook stock in two of his brokerage accounts.

110.    Around noon on May 8, 2023, Roberge called one of his brokers to ask why his purchases were on margin when he had transferred funds from his bank. During this call, Roberge said to his broker, "I don't touch these [brokerage] accounts very often."

111.    Between May 9, 2023, and June 7, 2023, Roberge and Ross Haghighat exchanged multiple text messages about getting together and also spoke on the phone. During this time period, Roberge purchased a net total of 3,400 additional Chinook shares.

112.    By purchasing Chinook stock based on the MNPI Ross Haghighat provided him, Roberge generated illegal profits of approximately $153,886 as of the close of regular market trading on June 12, 2023, the day of the merger announcement.

113.    On or around August 14, 2023, Roberge spoke with his broker to discuss selling his Chinook shares. During the call, Roberge told his broker: "Yeah, he kinda told me, um, Novartis was buying out, um, buying out, um, this Chinook. I think it was … actually, it was at $38 a share, but they had several contingent value conditions associated with it. That increased value of it … So several things that could bump the stock up to as much as $44 a share."

**H.     Ross Haghighat Purchased Chinook Stock Based On MNPI.**

114.    On June 8, 2023, just four days prior to the public announcement of Novartis's acquisition of Chinook, Ross Haghighat purchased 40 shares of Chinook stock in a custodial brokerage account, which he managed, in the name of a minor stepchild.

115.    Ross Haghighat made this purchase while aware that Novartis was negotiating to acquire Chinook.

22

116.    Ross Haghighat also knew, or was reckless in not knowing, that the information that Novartis was negotiating to acquire Chinook was both material and non-public.

117.    In making this purchase, Ross Haghighat breached his duty to Chinook to refrain from using the company's MNPI to purchase securities for his or anyone else's benefit.

118.    At the time of this purchase, Ross Haghighat knew or was reckless in not knowing that he was breaching his duty to Chinook to refrain from using the company's MNPI to purchase securities for his or anyone else's benefit.

## CLAIM FOR RELIEF
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder)

119.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 118 above.

120.    By engaging in the conduct described above, Defendants directly or indirectly, acting knowingly or recklessly, in connection with the purchase or sale of securities, by the use of means and instrumentalities of interstate commerce, or of the mails, or of a national securities exchange:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon certain persons.

121.    As a result, Defendants violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission requests that this Court:

A.      Enter a permanent injunction restraining Defendants and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

B.      Require Defendants to disgorge ill-gotten gains, plus prejudgment interest;

C.      Order Defendants to pay a civil monetary penalty pursuant to Section 21A of the Exchange Act [15 U.S.C. §78u-1];

D.      Enter an order, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. §78$u$(d)(2)], barring Ross Haghighat from serving as an officer or director of any issuer required to register securities with the Commission pursuant to Sections 12(b) or 12(g) [15 U.S.C. §78$l$(b), 78$l$(g)], or to file reports with Commission pursuant to Section 15(d) [15 U.S.C. §78$o$(d)], of the Exchange Act;

E.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

F.      Award such other and further relief as the Court deems just and proper.

Dated:  August 22, 2025
        Boston, Massachusetts


/s/ *David H. London*
David H. London
Andrew J. Palid
David M. Scheffler
Attorneys for Plaintiff
U.S. SECURITIES AND EXCHANGE COMMISSION
33 Arch Street, 24th Floor
Boston, MA  02110
(617) 573-8997 (London direct)
LondonD@sec.gov (London email)


## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, I certify that the matter in controversy alleged against

the Defendants in the foregoing Complaint is not the subject of any other civil action pending in

any court, or of any pending arbitration or administrative proceeding.


/s/ *David H. London*
David H. London
Andrew J. Palid
David M. Scheffler
Attorneys for Plaintiff
U.S. SECURITIES AND EXCHANGE COMMISSION
33 Arch Street, 24th Floor
Boston, MA  02110
Tel: (617) 573-8997 (London direct)
LondonD@sec.gov (London email)

**DESIGNATION OF AGENT FOR SERVICE**
**UNDER LOCAL CIVIL RULE 101.1(f)**

In accordance with Local Civil Rule 101.1(f), the undersigned hereby makes the

following designation for the receipt of service of all notices or papers in this action at the

following address:

United States Attorney's Office
District of New Jersey
Attention:  Alex Silagi
Assistant U.S. Attorney
970 Broad Street, Suite 700
Newark, NJ 17102


/s/ *David H. London*
David H. London
Andrew J. Palid
David M. Scheffler
Attorneys for Plaintiff
U.S. SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA 02110
(617) 573-8997 (London direct)
LondonD@sec.gov (London email)

26